## Staunton

VIVIAN S. LaDUE v. CLYDE J. CURRELL, ET AL.

September 3, 1959.

Record No. 4968.

Present, All the Justices.

The opinion states the case.

*Frank D. Swart*, for the appellant.

*H. Wise Kelly, Jr.; Kelly & Jennings*, on brief, for the appellees.

MILLER, J., delivered the opinion of the court.

On June 4, 1957, Clyde J. Currell and Dorothy Currell, his wife, hereinafter called complainants, instituted suit against Vivian S. La-Due (formerly Vivian Schaeffer), hereinafter called defendant, to establish and confirm their title to one acre of land in Centreville magisterial district, Fairfax county, Virginia. The acre in controversy

is bordered on the south by State route 658 and is shown within wide black lines on a plat dated May 10, 1958, attached to the final decree; the pertinent area of the plat is reproduced upon the diagram below:

The bill alleges that by deed of August 29, 1939, duly recorded, complainants acquired a tract of land of fifty-five acres and that they entered upon the premises. It is then alleged that since that date they exercised actual, notorious, continuous, hostile and exclusive possession of the area granted, but that in January, 1957, defendant owner of an adjoining parcel of land staked off a portion of complainants' land and asserted ownership of that area. Complainants prayed that their title to the parcel in controversy be quieted, established and confirmed, and that the claims of defendant to that part of their land be barred and extinguished.

Defendant's answer to the bill asserted that by deed of February 22, 1926, recorded June 2, 1927, she was conveyed a parcel of land described in the deed by metes and bounds, a computation of which amounts to slightly more than three acres and that the three-acre parcel includes the area in controversy, which is slightly more than an acre. The answer also stated that defendant's grant was earlier in point of time, her record title to the three-acre parcel was superior to complainants' title to any part thereof, and that defendant and her predecessors in title had been in continuous and exclusive possession and control of the entire three-acre tract of land since 1897.

The evidence was heard *ore tenus*, and the chancellor concluded that complainants had established their claim of adverse possession to the acre of land in question. From a decree carrying that finding into effect, defendant appealed.

In defendant's assignment of error the sufficiency of the evidence is challenged; it is asserted that complainants failed to prove the requisite elements of adverse possession.

The testimony having been heard *ore tenus*, all conflicts in the evidence and reasonable inferences deducible therefrom must be resolved in favor of complainants. *Packard Norfolk, Inc.* v. *Miller*, 198 Va. 557, 95 S. E. 2d 207.

A stipulation entered into by counsel for the litigants discloses that prior to 1900 Samuel Wells owned a tract of land which included the 55 acres acquired by complainants and the 3 acres acquired by defendant, and that the litigants claim title to their respective overlapping tracts of land from this common source. However, it also appears from the stipulation that the conveyance from the common grantor in defendant's chain of title was earlier in point of time than the conveyance in complainants' chain of title and that defendant's record title is superior to that of complainants.

The parcel of land acquired by defendant in 1926 is rectangular in shape. A recital in the deed stated that the parcel conveyed was two acres, more or less, but the metes, bounds, markers and specification of distances in prior deeds granting the same parcel of two acres, more or less, described a lot that fronts 285 feet on the north line of State route 658 and extends back between parallel lines 470 feet. Thus slightly more than 3 acres were actually granted to and acquired by defendant though it was assessed and taxed as two acres until 1958.

The parcel of three acres is more particularly shown on the diagram. The discrepancy in frontage on route 658 between 280.61 feet shown on the map as against 285 feet called for in the deeds is not accounted for, but the lesser depth of 466.74 feet on the west line and 459.79 feet on the east line as against the depth of 470 feet called for in the deeds is accounted for by the widening of the highway subsequent to the conveyances. The 55-acre tract acquired by complainants lies chiefly to the north and west of that granted defendant except for the one acre overlap or interlock shown within the heavy black lines.

Summarized, the pertinent testimony offered by complainants to establish their claim of adverse possession under color of title for the period of fifteen years required by § 8-5, Code 1950, follows:

R. Jackson Ratcliffe, who surveyed the area in controversy and made the plat of May 10, 1958, testified that he was unable to find or locate the stones, pegs or markers referred to in former deeds in the litigants' chains of title and thought that they had been destroyed by cultivation. Nor could he find the pipes at the corners referred to in the conveyance to complainants. He surmised that they might have been driven in the ground to avoid damage to mowing machinery. He did, however, observe remnants of wire embedded in a line of cedar trees shown on the map, which line of trees was about 25 feet to the east of the eastern line of the interlock.

Complainant, Clyde J. Currell, testified that in February, 1941, he and his wife moved from the District of Columbia to the dwelling on the 55-acre tract where they have lived ever since and that about the time of their purchase in 1939, the acreage was surveyed by Howard Clark and stakes placed at its different corners except on the west side where a walnut tree marked a point or angle in the line.

In describing the area owned by Vivian Schaeffer (now Vivian S. LaDue), which is about 400 yards south of the Currell residence, he said that it was covered with honeysuckle, different kinds of

shrubs, underbrush and pines, and that there was evidence of an old barbed wire fence strung along trees and posts on three sides of her land, but he conceded that the interlocking area did not extend eastwardly to the line of the old fence along the cedar trees. He also testified that some years ago when he saw defendant and her husband at the premises, he showed them the stakes on the line of Clark's survey, which were some twenty feet west of the line of cedar trees and that defendant was "elated because she had more road frontage than the old line of fence" along the cedar row; she then asserted no claim to any land west of the staked line.

When Currell and his wife moved from the District of Columbia to the premises in February, 1941, their acreage consisted of part woodland and part open land. None of it was in cultivation, but he said that he had the fields mowed for the sake of appearance, though no specific years or times during which mowing was done in the first five or six years of their occupancy is stated. His testimony as to what mowing was then done follows:

"Q. What, if anything, did you do to the fields of the premises?
"A. We just kept them looking nice.
"Q. Were they in a state of cultivation when you bought them?
"A. No, there was just a plain field there.
"Q. What did you do to it, if anything?
"A. Kept it mowed down."

He further testified that "after the war" when his neighbor, Commander Yeomans "started expanding his farming activities", he arranged with the Commander to have "his man put in crops there." The area lying westwardly from the line of cedar trees, the interlock, the strip between the interlock and the cedar trees, and other areas were cultivated and tilled by Yeomans and mowed from time to time. This cultivation and mowing was done through an understanding whereby Yeomans furnished the Currells with fresh vegetables and Yeomans kept the crops and hay and thereby "made a much more presentable front field than to let it grow up."

When cross-examined concerning the years during which the strip of land between the interlock and the line of cedar trees, the interlock acre, and the fields adjoining the interlock were cultivated or mowed, Currell said that under their "barter agreement" he allowed Commander Yeomans, who lived across the road, to cultivate and raise corn "followed with some grains and later with something else," and this cultivation was for the four years between 1946 or 1947

and 1952. His testimony on cross-examination concerning the specific years in which the land was plowed follows:

"Q. Can you stand in your house and look out the window and see any of this property?

"A. Indeed we can.

"Q. How many years did you plow this area?

"A. Well, I am trying to think back now when it was first put to plow, and I think it was in '46 or '47 when it was first put to the plow.

"Q. I didn't ask you when it was first plowed; I asked you how many years you plowed it?

"A. Well, I would say between twelve and thirteen years.

"Q. You mean twelve or thirteen separate years you plowed that land?

"A. Well, I didn't understand the question; I'm sorry. It wasn't plowed every year.

"Q. How many different years did you plow or had it plowed?

"A. I believe about four years it was plowed—four different years.

"Q. Approximately, over what period of time?

"A. That would be between '46 and the last time it was plowed— maybe '52; somewhere around there. Between '46 and '52."

The testimony of Dorothy Currell is confirmative of and substantially the same as that of her husband. However, in addition she said that in the years 1941 and 1942, they mowed "all of the open parts to keep it neat," and that the pipe stakes put in the boundary lines by Howard Clark when he surveyed the property in 1939 were visible for about fifteen years thereafter. She also testified that there was a different color to the vegetation on the acreage lying westwardly from the east line of the interlock from that to the east of the interlock indicative of no seeding of the latter area that constituted a discernible line between their property and defendant's property when viewed from their house, which was on an elevation, but this was not obvious from the road. On cross-examination she admitted that in 1939 or 1940 shortly after she and her husband purchased the 55 acres she went to Washington, D. C., to see defendant in an effort to purchase the controversial area, discussed its purchase with defendant when the latter visited her about 1941, and that on one occasion she wrote to defendant about acquiring the property but the date of this communication is not stated.

J. R. Eagle, a farmer living in the community, testified that he

had visited complainants at their home on occasions since 1942 or 1943, and that in 1950 he was requested by them to mow the area in front of their house. The fields described as having been mowed by him were the interlock, the strip east of the interlock, and considerable other acreage. In mowing this large field, which took about three days, he saw evidence that considerable acreage, including the interlock, had been previously cultivated for old corn rows were observable; he could not say how long it had been since the area was plowed. He also said that when he was requested by Currell to mow the field, the later remarked that "his object in mowing was to clean it up and keep it in a nice condition," Currell gave him the hay for doing the mowing.

Aubrey A. Graves, who lives across route 658 from complainants' property, testified that he moved to that vicinity in 1950 and had known complainants since 1951. At their request he cut the hay—timothy and lespedesa, the latter of which reseeds itself from year to year—from the fields, including the interlock, in 1953, 1954, and 1955. He used the hay for his livestock. When he mowed the acreage, he was requested to cut the strip between the interlock and the line of cedars, which complainants indicated did not belong to them, but "it had been their custom to keep it clipped so it wouldn't be an eyesore."

The testimony of defendant, Vivian S. LaDue, Nora Buckley, Ethel Schaeffer and Daniel Whitmer, the latter two of whom lived near the property in question, is in sharp conflict with that of complainants. However, as all conflicts and just inferences must be resolved in favor of complainants, it is sufficient to say that the testimony of these four witnesses was to the effect that the interlock acre had been plowed only once during the last twenty years and that was in 1949 when Daniel Whitmer personally plowed and planted that area in corn at the instance of Ethel Schaeffer. Whitmer also said that at the same time, upon the direction of Commander Yeomans, he also plowed and planted the adjoining Currell land in corn, and he sowed grass seed furnished by Yeomans on both areas.

Defendant proved no actual possession of the land in question, but she is under no obligation to do so. Her senior grant confers upon her constructive possession of the parcel of slightly over three acres, and her constructive possession to the limits of her boundary continues good regardless of the junior grant unless and until there is a disseisin. To constitute disseisin it is just as necessary for claimants

to take *actual possession* of some part of the interlock as if they had entered without color of title. To be effective the entry must be with intent to oust the owner and the possession must be evidenced by some act or acts indicating an actual possession of the land itself, as distinguished from mere sporadic taking of the products thereof. *Craig-Giles Iron Co.* v. *Wickline and Others*, 126 Va. 223, 101 S. E. 225.

The usual kind of actual possession relied upon is occupancy, use or residence upon the premises for the statutory period of time, evidenced by cultivation, enclosure, or erection of improvements, or other plainly visible, continuous and notorious manifestation of exclusive possession in keeping with the character and adaptability of the land. 1 M. J., Adverse Possession, § 5, p. 224. To effect a disseisin the holding must be actual and hostile occupation of the land for the statutory period that is calculated to give notice that the seisin is molested. 1 M. J., Adverse Possession, §§ 5, 10, and 11.

"In determining whether particular acts of ownership indicate an adverse possession, the usual and ordinary use of similar lands by their owners should be taken into consideration. No precise rule of general application can be laid down. Any act, or series of acts, which shows the open, notorious, exclusive, and hostile possession of one who claims to be the owner of the land may be proven as evidence of adverse possession. * * * However, irrespective of the character of ownership asserted, acts of dominion over the land must, to be effective as against the true owner, be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that his lands are in the adverse possession of another. A mere temporary use of the property by a trespasser at intervals, whether such intervals are remote or frequent, is not enough." 1 Am. Jur., Adverse Possession, § 132, p. 867.

Here the questioned area was never enclosed by complainants nor was any improvement erected thereon. They rely solely upon periodical or occasional cultivation and mowing of the grass upon this and adjoining areas, the mowing having been concededly done for the purpose of appearance. The grass was cut upon this acre and other acreage solely to keep it neat and presentable, and this incidental use is not shown to have been known to defendant. The fact that shortly before the fields were first mowed efforts were made by complainants to buy the acre from defendant also tends to negative any intent to then oust the owner and hold adversely.

The evidence fails to prove any cultivation of the interlock until 1946. In the unequivocal words of Currell, it was not until 1946 or 1947 that the area "was first put to plow" and cultivated in corn followed by grain and something else for four different years until 1950 or 1952. The hay that had been sown at some time during this interval was cut at times for appearance sake until about 1955, but there is no testimony to prove that the area was plowed or planted before 1946 or after 1952.

It is doubtful that complainants entertained any intent to oust the defendant during the years prior to 1946 when the only activity carried on upon the land and adjoining acreage was the mowing of wild hay and other growth for the sake of appearance. Certainly that sporadic and temporary activity upon the interlock, as well as upon adjoining areas, constitutes insufficient evidence of actual, hostile and notorious possession that would be calculated to give notice to the owner that her seisin was being molested. *Christian* v. *Bulbeck*, 120 Va. 74, 90 S. E. 661; 1 Am. Jur., Adverse Possession, § 139; 2 C. J. S., Adverse Possession, § 33, p. 547.

Though all conflicts in the evidence and just inferences deducible therefrom be resolved in favor of complainants, still there were no acts on their part prior to 1946 that were sufficiently notorious and visible or of such possessive and hostile character as to manifest a claim of ownership to the property in controversy.

Even if it be conceded that complainants may have held actual, exclusive, visible, hostile and continuous possession of the acre since 1946, when it was first plowed, planted, and cultivated, along with other acreage, yet it is clear that no actual, visible and hostile possession was taken prior to that year. As those necessary elements of adverse possession did not exist prior to 1946, complainants have not held the land adversely for the requisite statutory period.

It necessarily follows that the decree appealed from must be reversed and the cause remanded to the trial court for the entry of a decree denying the relief prayed for in the bill and confirming defendant's title to the area in controversy.

*Reversed and remanded.*