## CIRCUIT COURT OF SPOTSYLVANIA COUNTY

Gertrud M. Klackner

v.

Marvin Willis et al.

By JUDGE WILLIAM H. LEDBETTER, JR.

November 19, 1987

Simply stated, this is an adverse possession case. The litigation began in 1984 when Gertrud M. Klackner (Klackner) filed a bill to quiet title, asserting sole ownership of the subject property by adverse possession in excess of fifteen years.

The essential facts are not in dispute.

In 1952, seven persons, including Joseph W. Lewis (Lewis) and Loucrisser Willis (Willis), acquired title to the subject property by deed. Thereafter, five of the co-owners conveyed the land to William M. Rogers (Rogers). Neither Lewis nor Willis joined in that deed, and Rogers never acquired their outstanding interests.

In 1964, Rogers sold the land to Klackner and her husband. In 1966, Klackner acquired her husband's interest.

The land in controversy consists of approximately sixty-three acres (originally, about sixty-four acres) located on the north side of Route 632 in rural Spotsylvania County. The property is unimproved, mostly timberland.

At the time Klackner and her husband purchased the property, they lived in Fort Belvoir. Klackner testified they visited the property almost every weekend to cut wood, to build a path, and to begin clearing an area for

a cabin. No construction was ever commenced, however, and they separated in 1966.

After the divorce and Klackner's acquisition of her husband's interest in the property, Klackner visited the property less frequently. In 1971, she purchased property nearby as a weekend home. While remodeling the house located on that property, she kept "a good eye" on the subject property and often went over there to "pick flowers" and walk through it "to see if everything is okay." She posted "no trespassing" and "no hunting" signs along the front of the property.

She sold the weekend home in 1976. Thereafter, her visits to the property were infrequent.

Except for the negligible clearing work done with her husband between 1964 and 1966, and the posting of signs at some points during the 1970's, Klackner's only direct contacts with the property were her visits to cut wood, pick flowers, and walk through the woods. The land was not cultivated or timbered. No portion of the land was enclosed. No improvements were constructed. No livestock was kept on the property. She never used or occupied the land in any manner palpable to the senses.

In 1980, Klackner had the property surveyed. On the recommendation of the surveyor, she entered into a boundary line agreement with some of the adjoining landowners. In October of that year, she conveyed a 0.6867-acre parcel to another adjoining landowner so that he could "square up" his property, and she conveyed a 0.2715-acre parcel to yet another adjoining landowner to eliminate the encroachment of a drainfield.

Klackner has paid the real estate taxes on the land continuously since 1964.

According to Klackner's testimony, she first learned of the defect in her title in 1983 from one of the adjoining landowners to whom she had sold a portion of the property. She consulted an attorney, and this litigation ensued.

Laurie Ann Harty (Harty) is a descendant of Lewis. She, like Klackner, resides in Northern Virginia. She was aware that the property was sold in 1964, although she did not know that it was Rogers who purchased it. From time to time she would ride by the property with her mother, particularly during the time she lived in Spotsylvania County, 1970 to 1979. At no time did she

see anyone on the property or evidence of any activity on the property. She denies ever having noticed the posted signs referred to by Klackner. No one in the family discussed the sale with her, but, according to Harty, "it was always rumored that development was going to begin" and she drove by the property from time to time "to see if development had begun."

In essence, until she received notice of this suit, Harty always had assumed that her family effectively sold the property in 1964. She was not aware that she owned an undivided interest in the property. She was not aware of its sale by Rogers to Klackner. She maintained an idle curiosity in the property because of her family's prior association with it.

### Adverse Possession

To establish title to land by adverse possession, it is necessary to show actual, hostile, exclusive, visible and continuous possession for the statutory period of fifteen years. *McIntosh v. Chincoteague Volunteer Fire Company*, 220 Va. 553 (1979); Virginia Code § 8.01-236. The burden of showing the essential elements of adverse possession is upon the person asserting such ownership. *Peck v. Daniel*, 212 Va. 265 (1971).

In this case, the issue of adverse possession was referred to a commissioner in chancery. A hearing was conducted and the commissioner filed his report. The commissioner found that Klackner had failed to prove the essential elements of adverse possession. (The commissioner went on to find, nevertheless, that Harty's claim should be denied on the ground that she is guilty of laches. This aspect of the commissioner's report is discussed separately below.)

The commissioner concluded that the evidence with respect to Klackner's association with the land was insufficient to constitute actual, exclusive, visible possession (sometimes referred to in the cases as "open and notorious" possession).

To satisfy the requirements of adverse possession, the claimant must possess the land in such a way as to amount to an ouster of the true owner; i.e., in such a

manner as to give notice "that seisin is molested." *LaDue v. Currell*, 201 Va. 200 (1959).

> The usual kind of actual possession relied upon is occupancy, use or residence upon the premises for the statutory time, evidenced by cultivation, enclosure, or erection of improvements, or other plainly visible, continuous and notorious manifestation of exclusive possession in keeping with the character and adaptability of the land . . . . To effect a disseisin, the holding must be actual and hostile occupation of the land for the statutory period that is calculated to give notice that the seisin is molested . . . .
> No precise general rule of application can be laid down. Any act, or series of acts, which shows the open, notorious, exclusive and hostile possession of one who claims to be the owner of the land may be proven as evidence of adverse possession. However, irrespective of the character of ownership asserted, acts of dominion over the land must, to be effective as against the true owner, be so open, notorious and hostile as to put an ordinarily prudent person on notice of the fact that his lands are in the adverse possession of another. *LaDue, supra; also see Harman v. Ratliff*, 93 Va. 249 (1896).

It is said that the claimant must establish use of and dominion over the land or such visible change in its character as amounts to a complete ouster of the superior record title. 1A M.J., *Adverse Possession*, sects. 4, 5 and 6. With particular regard to uncleared lands, such as in this case, it has been held that such lands are not susceptible of adverse possession unless by acts of ownership effecting a change in their condition, such as enclosure, cultivation, occupancy, or other open and habitual acts of ownership. *see Harman, supra*, and *Richmond v. Jones*, 111 Va. 214 (1910).

After taking evidence, including the testimony of witnesses taken in his presence, the commissioner has

reported that Klackner has failed to establish title to the land by adverse possession. While a report of a commissioner does not have the weight given to a jury verdict, it is entitled to respect and cannot be arbitrarily disturbed. *See* Virginia Code § 8.01-610, and the cases cited in the annotations. No exception was taken to this aspect of the report.

The commissioner's findings with regard to this issue are clearly supported by the law and the evidence and will be confirmed.

## *Laches*

Despite Klackner's lack of proof of adverse possession, the commissioner has recommended that title to the land be vested in Klackner because Harty is guilty of laches.

Laches is an equitable principle defined as inexcusable delay in the enforcement of one's rights, to the prejudice of the other party. It prevents the prosecution of stale claims in courts of equity, in much the same fashion as statutes of limitation apply to legal claims and demands. Lapse of time, standing alone, does not give rise to laches. Rather, the doctrine applies where prejudicial delay in asserting a right, by one who is knowledgeable of his rights or has means of knowing his rights, works to the disadvantage of another. *See* 7A M.J., *Equity* § 26; *Hagan Estates, Inc. v. New York Mining Co.*, 184 Va. 1064 (1946).

It is well settled that, as a general proposition, equity will follow the law in applying statutes of limitation. If a legal demand is not barred by statutory law, neither is it barred in equity. *Hagan Estates, supra*; Lile, *Notes on Equity Jurisprudence*, pp. 18-21 (1921).

It is also well settled that, ordinarily, laches cannot be set up as a bar to legal title to land. *See New v. Harman Coal Company*, 181 Va. 627 (1943); 7A M.J., *Equity* § 35.

However, as the cited cases and other authorities point out, there are exceptions and variations to these rules.

The doctrine of adverse possession has two facets. First, from the point of view of the record owner seeking to recover the land, the doctrine acts as a procedural bar to enforcement of his right to exclude others from

his property. In this sense, the doctrine (now codified) is similar to other statutes of limitation which, for example, set up time bars to actions relating to contract rights, repayment of money owed, damages for personal injury, etc. Second, as a rule of property law, the doctrine acts as a transfer device for legal title to real estate. Viewed from this perspective, the effect of adverse possession for the statutory period is to divest title of the record owner and to transfer it, involuntarily, to the adverse claimant. Stated differently, adverse possession is one of the modes of title transfer long recognized by the law of real property in English and American jurisprudence.

With these elementary principles in mind, the question may be framed as follows: Can a court of equity apply the doctrine of laches in favor of an unsuccessful adverse possession claimant, with the result that legal title of the record owner is divested despite the claimant's failure to establish title by adverse possession? An affirmative answer suggests that laches can be applied to dilute the historical rigidity of the doctrine of adverse possession, at least under certain circumstances.

Or, the question may be put another way: Must a claimant who has failed to prove his title by adverse possession always lose to the record owner, even where, for example, the record owner was aware that the property had been sold, assumed that his predecessors had conveyed good and proper title, and did nothing, relying upon such erroneous assumption, for more than twenty years?

Of course, other phraseology may be used to pose the question, but the essential point persists: the application of laches in an unsuccessful adverse possession case, where the result is to transfer title to the claimant, notwithstanding his failure to prove adverse possession, is a troublesome matter. Especially is this true in light of the general rules noted above, coupled with the maxim that "equity follows the law." *See* Lile, *Notes, supra* at p. 18.

In support of his finding that laches does apply under the circumstances of this case, the commissioner cites two Virginia cases: *Camp Manufacturing Co. v. Green*, 129 Va. 360 (1921), and *Kennedy Coal Corporation v. Buckhorn Coal Corporation*, 140 Va. 37 (1924). Language can be found

in both of these cases to support the proposition recommended by the commissioner. In *Kennedy Coal*, the court said at one point that "even if the technical bar of the statute of limitations does not apply, [a claimant] can be barred by laches and acquiescence." The facts of these cases are confusing and complex and certainly are not "on all fours" with the case under consideration.

The court notes Harty's assertion, not mentioned in the commissioner's report, that laches is an affirmative defense and cannot be applied against a respondent who seeks no relief other than to defend his record title.

On the issue of laches, the court requests that the parties address the specific question of the applicability of laches in supplemental memoranda to be filed by December 30, 1987. To assist the court, counsel are invited to comment upon Harty's assertion noted above; to comment upon whether *Camp Manufacturing* and *Kennedy Coal* have any precedential value; to furnish copies of any decisions from courts of other states specifically involving the applicability of laches in adverse possession cases; to comment upon the binding applicability of laches in adverse possession cases; to comment upon the binding effect of the legal rules of adverse possession upon a court of equity; and to comment upon the significance or insignificance of the particular facts of this case.

Upon receipt and review of the memoranda, the court will render a written opinion finalizing this issue.

### January 20, 1988

This supplements the letter opinion dated November 19, 1987. In that opinion, the commissioner's determination that Klackner failed to establish title by adverse possession was confirmed, and the court requested that counsel submit additional memoranda on the issue of laches. Counsel have filed their memoranda.

The facts of the case are detailed in the earlier opinion.

Laches has become an issue in this litigation in a peculiar way: Klackner, having failed to establish title to the subject property by adverse possession, argues that she should prevail nonetheless because Harty (a de-

fendant) has failed to assert her superior record title in a timely fashion.

Laches is defined as inexcusable delay in the enforcement of one's rights which works a disadvantage to another, warranting the presumption that the party has waived or abandoned the right. Laches is a question of inequity of permitting a claim to be enforced, based on delay attended by a change of condition or relation. It involves an omission to do what the law requires to protect one's rights under circumstances misleading or prejudicing an adverse party. 7A M.J., *Equity*, § 26; *Black's Law Dictionary* (4th ed.) p. 634.

All of the authorities agree that more than delay is necessary in order to invoke the doctrine. There are at least five aspects of the equitable doctrine of laches that must be considered in determining whether laches applies in this case.

First, knowledge of one's rights is an essential ingredient. Equity will not apply laches against one who is ignorant of his rights. Although ignorance due to negligence is no excuse, equity requires only that degree of diligence as circumstances reasonably suggest.

Second, laches is delay that works a disadvantage to another. There must be some prejudice shown, such as a change of position that was induced by or resulted from the conduct or silence of the party against whom the doctrine is asserted. The question is often posed: Did the party's conduct or silence mislead the other party to part with money, property, or other thing of value, or to otherwise change his position prejudicially?

Third, laches is an equitable defense. It arises when a claimant should not be permitted to assert an equitable right because of unconscionable delay coupled with knowledge of the claimant and disadvantage to the defendant. In equity procedure, it is asserted by special plea or, in modern practice, as an affirmative defense. In Virginia, at least one case has indicated that the court, on its own, may dismiss a bill which asserts a patently stale claim. *See Camp Manufacturing Co. v. Green*, 129 Va. 360 (1921). Nowhere, however, has a case been found in which laches is asserted as an alternative theory of recovery by a complainant.

Fourth, the authorities are unanimous that laches cannot be set up as a bar to legal title to real estate, except in extraordinary circumstances.

Fifth, it is well settled that, as a general proposition, equity will follow the law in applying statutes of limitation.

As authority for the aforesaid equitable principles, see *Hagan Estates, Inc. v. New York Mining Co.*, 184 Va. 1064 (1946); 7A M.J., *Equity* §§ 26-48; 27 Am. Jur. 2d, *Equity* §§ 152 et seq.

Upon an analysis of all these aspects of the doctrine, the court is of the opinion that laches has no applicability to this case.

Harty's family acquired the subject property in seven undivided shares in 1952. In 1964, five of the seven co-tenants sold their interests in the property to William M. Rogers, Klackner's predecessor in interest. Thus, the relevant conveyance occurred twenty years prior to the time Klackner sought to quiet her title by instituting this suit against Harty and others.

Two decades is a long time. All of the co-tenants are deceased. However, there is nothing in the record to suggest that this mere lapse of time has rendered it impossible to ascertain the nature and circumstances of the conveyance or the status of the chain of title. Everyone agrees that the land records are clear. In her bill, Klackner alleges that Harty's predecessor in interest was already dead in 1964 when his relatives sold their interest in the property to Rogers. There is no evidence that anyone approached Harty, his heir, about the sale; and, unlike *Camp*, it is obvious that neither Harty nor the predecessor through whom she claims ever agreed to or acquiesced in the sale or benefited from it.

As for the essential ingredient of knowledge, what did Harty know that now bars her from asserting her record title? Klackner makes much of the fact that Harty has admitted, in her testimony, that she "knew" that the property had been sold. This knowledge, Klackner says, is an acceptable substitute to the "open and notorious" element of adverse possession. In other words, since Harty "knew" that someone else owned the property, the purpose of the "open and notorious" element -- to put

the record owner on notice of the adverse possessor's claim -- is adequately supplied.

The argument is enticing, but, at bottom, it misses the point. Harty did *not* know that Klackner claimed title to the property. She had never heard of Klackner before this litigation began. Nor did she know Klackner's predecessor, Rogers. Despite her most diligent efforts, there is no way that she *could have known* of Klackner's claim because -- and this is the very purpose of the several elements of adverse possession -- neither Klackner nor her predecessor ever established use of or dominion over the land and never did anything to effect a visible change in its character to amount to an ouster or to give notice "that seisin is molested." *See LaDue v. Currell*, 201 Va. 200 (1959). Harty's mistaken belief that her family had conveyed the property, including any interest which she may have had, is not the "knowledge" contemplated either in the law of adverse possession or in the doctrine of laches.

In fact, the record is clear that Harty did *not* have knowledge of *her interest in the property*. This lack of knowledge was the basis of her mistaken belief that the property had been conveyed to someone. Unaware of her interest in the property, Harty cannot be faulted for a failure to assert it. There is no evidence from which the court can conclude that she knew or should have known that she had a claim to a one-seventh interest in the property or that Klackner was asserting an adverse claim; in fact, the evidence is to the contrary. Courts of equity are extremely reluctant to deny to a claimant an acknowledged right unless that right is clearly shown to have been abandoned. 7A M.J., *Equity* § 26.

To what disadvantage has Klackner been subjected as a result of Harty's inaction? Klackner has not improved, enclosed, cleared or cultivated the land. She had done nothing to enhance its value. She has not possessed the land "openly and notoriously" and has effected no visible changes to it. Nothing that she had done, in fact, was induced or encouraged by the silence of Harty. Rather, her mistaken belief that she was the sole fee simple owner was based on her deed from Rogers, accompanied by covenants of general warranty and a certificate of title.

In a case of this nature, it can be said that a person's disadvantage or prejudice, if any, is governed or measured by the law of adverse possession itself. Thus, if one possesses land openly, adversely, notoriously, exclusively and continuously for the statutory period (fifteen years), he establishes a level of conduct and activity with respect to the property such that it would be unacceptably prejudicial to oust him from the property; but, on the other hand, if he fails to establish these elements, the law deems that he would not suffer undue disadvantage or prejudice if he were ejected in favor of the rightful owner.

Next, it must be observed that Klackner, as complainant, asserts laches not as an equitable defense but as a positive claim to legal title. She is an unsuccessful adverse possession claimant. Nevertheless, she seeks to apply the doctrine of laches to divest Harty of her superior record title. This suggests that laches can be used as an affirmative claim of right, and further suggests, under the facts of this case, that laches can be applied to dilute the requirements of adverse possession.

Although it is unnecessary to decide here whether laches can be asserted by a complainant under any circumstances, it is appropriate to note that laches should be used as a shield, an equitable defense, and not as a sword for the investiture of title, *See* 27 Am. Jur. 2d, *Equity* § 152. It is a misuse of the doctrine of laches for a moving party to assert it as an alternative method of acquisition of title to real estate.

Finally, application of laches in this case would violate the well-settled rule that equity generally follows the law in statute of limitations cases, especially where, as here, the statutory limitation is material to the claim. It is said that in respect to statutes of limitations, if a claim is barred by statutory law, it is barred in equity; and if the claim is not barred by statutory law, it is not barred in equity. 7A M.J., *Equity* § 26; 27 Am. Jur. 2d, *Equity* § 161.

Here, Harty's claim to a one-seventh interest in the subject property is not barred by the statute of limitations, and this court finds no compelling reason why equity should not follow the law.

For the foregoing reasons, it is the opinion of the court that Harty is not barred by the statute of limitations or by the doctrine of laches from asserting her claim to a one-seventh undivided interest in the property.