COURT OF APPEALS OF VIRGINIA

Present: Judges Friedman, Raphael and White
Argued at Richmond, Virginia


BESSIE MAY SANDERS

MEMORANDUM OPINION[*] BY
v.      Record No. 0062-25-2          JUDGE FRANK K. FRIEDMAN
FEBRUARY 24, 2026

AMOS J. EASTER, ET AL.


FROM THE CIRCUIT COURT OF AMELIA COUNTY
Joseph M. Teefey, Jr., Judge

Benjamin M. Andrews (Andrews Law PLC, on briefs), for
appellant.

Bradley D. Foster (Robert E. Hawthorne, Jr.; Derrick P. Fellows;
Hawthorne & Hawthorne, P.C., on brief), for appellees.


This case concerns the ownership of an 8.26-acre parcel of land located in Amelia

County ("the Disputed Land"). Appellant[1] Bessie May Sanders appeals the circuit court's

judgment that appellees Amos and Patricia Easter acquired title to the Disputed Land by adverse

possession. Sanders argues that the circuit court erred by (1) tacking prior use of the Disputed

Land to the Easters' uninterrupted period of possession beginning in 1998; (2) failing to weigh

Sanders' payment of, as well as the Easters' nonpayment of, taxes for the Disputed Land as

evidence that the Easters failed to make an adequate claim of title; and (3) concluding that the

Easters had established all the elements of adverse possession. For the reasons below, we affirm

the circuit court's judgment.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Sanders was one of two defendants below. The co-defendant, Victor Bailey, is a joint
owner of the subject property, but did not participate in this appeal.

BACKGROUND[2]

All 8.26 acres of the Disputed Land are part of a 57-acre parcel legally owned by Sanders and her predecessors in title. Approximately 2 of the 8.26 acres are open land that the Easters have farmed for decades. The remaining acres are wooded land. The Disputed Land is bordered on the north by Sanders' land; on the east by Virginia State Route 639; and on the south and west by the Easters' land.

In 1938, Lewis Easter, father of appellee Amos Easter, acquired a parcel of land from one Emily Jackson. The deed conveying the parcel to Lewis Easter says it contains "about 30 acres," but its description of the land—referencing adjoining landowners and roads—appears to include the 8.26 acres at issue. In other words, the description in the deed appears to encompass approximately 38.26 acres. Nevertheless, it is uncontested that Sanders and her predecessors in title were, at all relevant times, the legal owners of the Disputed Land. Only 30 of the 38.26 acres described in the deed were Lewis Easter's undisputed property.

Lewis Easter maintained a farm on the Disputed Land for the next 49 years. In 1987, by deed of gift, he conveyed his 30-acre parcel to his son and daughter-in-law, Amos and Patricia Easter. Amos testified at trial that he and his family had considered the Disputed Land to be part of their property for all his life and that they had "always farmed it."

The evidence at trial established that the Easters used and possessed the Disputed Land in the following ways.[3]

---

[2] On appeal, we consider the evidence in the light most favorable to the Easters, the prevailing party below, "granting them the benefit of any reasonable inferences." *Veldhuis v. Abboushi*, 77 Va. App. 599, 607 (2023).

[3] The only evidence of Sanders' use of the Disputed Land came from the testimony of one of her relatives, Lisa Sanders. The circuit court, however, found much of her testimony unreliable and placed no weight on the portion concerning exercise of ownership. We defer to the circuit court's credibility determinations. *See Suffolk City Sch. Bd. v. Wahlstrom*, 302 Va. 188, 223 (2023).

**Woods Roads.** Lewis Easter had a road cut through the forest portion of the Disputed Land sometime in the 1950s to harvest timber. The woods road starts near the public road on the Easters' undisputed property, crosses through the Disputed Land, and then exits onto other property owned by the Easters. Lewis maintained the road until he conveyed his acreage to Amos and Patricia in 1987. Amos and Patricia did not start regularly maintaining the road until 1998. That was when they granted Patricia's brother, Ray Atkins, hunting rights on the land. In exchange, Ray has, among other things, maintained the existing woods road and built additional roads on the Disputed Land. Ray uses a tractor to bushhog these woods roads (i.e., clear them of trees and brush) at least once a year. And he and his family often drive pickup trucks and ATVs on the woods roads during hunting season. Lastly, in the early 2000s, around 20 years before this trial, Ray put a steel cable with a lock on it across the entrance to the woods road (on the Easters' undisputed property) to limit access to it.

**Timber Harvesting.** At some time in the 1950s, after he made the woods road, Lewis Easter used said road to conduct a select-cut timber harvest in the wooded portion of the Disputed Land. He did the same thing sometime in the 1960s. Amos Easter then directed select cuts twice, once in 2011 and once in 2012. During those last two harvests, up to 30% of the trees on the Disputed Land were cut. One of the Easters' expert witnesses testified that the logging activity would have been apparent to the untrained eye.

**The Farm.** As noted above, Amos Easter testified that he and his family had "always farmed" the two-acre open portion of the Disputed Land. After Amos received his father's property, he enrolled the farm in a soil conservation program for several years. The terms of that program allowed the property to be bushhogged once a year. Starting in or around 2000, the Easters had Jimmy Dawson bushhog it each year on their behalf. It usually took Jimmy one or two days to do so. When the soil conservation program ended around 2013, the Easters

permitted Russell Wills, Jimmy's cousin, to cut the hay on the Disputed Land. The Easters then began renting the open portion of the Disputed Land (as well as portions of their undisputed property) to Russell; he has been cutting the hay on the Disputed Land twice a year since 2014. Russell uses a large tractor to cut, rake, and bale the hay. The whole process requires him to be on the property four or five days each year. He testified that the open portion of the Disputed Land looks significantly different after the hay has been cut.

**Trespassers.** At some point between 1987 (when Lewis Easter gave his property to Amos and Patricia) and 1998 (when Amos and Patricia granted Ray Atkins hunting rights on the land), a group of hunters began trespassing on the Disputed Land. Amos was living in Chile at the time (around 1998 or 1999), so he did not know that the hunting club was using the land. When Ray told him, Amos asked Ray to "get them out." Ray confronted the hunters and ejected them from the Disputed Land. And at Amos' request, Ray posted about 20 "no trespassing" signs on the trees between the Disputed Land and Sanders' undisputed property. Ray has since posted new "no trespassing" signs every three years. Ray also installed cameras on the Disputed Land about six years before trial to help catch trespassers.

**Tree Stands.** In the early 2000s, Ray built several permanent tree stands in the wooded portion of the Disputed Land for hunting. He has maintained them ever since.

**Stacking Bricks.** At trial, Amos recalled tearing down an old house with his father on their undisputed property. Lewis and Amos salvaged the bricks from the house's two chimneys and stacked them on the Disputed Land near the public road. Amos testified that they were visible from the road. He explained that the bricks remained there for about 20 years until his nephew took them and used them.

The Easters filed a complaint to quiet title and a motion for declaratory judgment in 2017. After receiving evidence *ore tenus* and hearing argument from counsel on October 24, 2024, the

circuit court concluded that the Easters had "established adverse possession of the disputed land by clear and convincing evidence." It therefore granted their motion for declaratory judgment, directing "that title be perfected in the plaintiffs."

In its letter opinion, the circuit court found that the Easters had satisfied each element of adverse possession. First, the Easters actually possessed the Disputed Land because they regularly cultivated the open portion, created and maintained new woods roads, periodically harvested timber, and constructed permanent tree stands for hunting. Second, the Easters' possession was hostile because, based on the description of the property in the deed from Emily Jackson and an erroneous Amelia County tax map, Amos and his parents mistakenly believed that the Disputed Land was part of their property. Third, the Easters exclusively possessed the Disputed Land because, according to the circuit court, it had "received no evidence that anyone other than the [Easters] used the disputed land." The court added that Sanders had apparently made no use of either the Disputed Land or her adjoining undisputed property. Fourth, the Easters' possession was visible, open, and notorious because the decades-long cultivation of the open land, the twice-yearly cutting of hay, the timber harvests, the "no trespassing" signs, and the stack of bricks were all reasonably visible (and in the case of the timber harvests, audible) from the public road. Fifth, the Easters possessed the Disputed Land continuously for the statutorily required 15 years. Importantly, the court held that the Easters' period of ownership, "especially the period from 1998 to the present," established their continuous possession. It then tacked Lewis Easter's possession of the Disputed Land onto Amos and Patricia's possession. Finally, the Easters' possession of the Disputed Land was under a claim of right because, as already mentioned, Amos and Patricia mistakenly believed that the Disputed Land was part of their property.

The circuit court did not discuss in its letter opinion the evidence that had come in about the payment of taxes on the property. That evidence tended to show that Sanders and her predecessors in title paid taxes on the Disputed Land for over 100 years while the Easters paid taxes only on their undisputed 30 acres.

The circuit court entered its final order on December 3, 2024. Sanders noted her several objections to the order and accompanying letter opinion. This appeal followed.

ANALYSIS

I. Standard of Review

"Issues of adverse possession and prescription present mixed questions of law, reviewed de novo, and fact, to which the reviewing court gives deference to the determination of the trial court." *Scott v. Burwell's Bay Improvement Ass'n*, 281 Va. 704, 709 (2011). "The testimony having been heard *ore tenus*, all conflicts in the evidence and reasonable inferences deducible therefrom must be resolved in favor of [the appellees]." *La Due v. Currell*, 201 Va. 200, 202 (1959).

II. Sanders Failed to Properly Preserve Her First Argument

Sanders first argues that the circuit court erred by tacking Lewis Easter's possession of the Disputed Land onto Amos and Patricia's possession. She also argues that the court erred by relying on "acts prior to confirmed nonexclusive control (including road cutting and timber harvests from the decades before the Plaintiffs' acquisition of their undisputed property) to cumulatively determine actual possession, as well as to conclude that the Plaintiffs exercised visible, open, and notorious use of the disputed property." The "nonexclusive control" to which she refers is presumably the period during which hunters were trespassing on the Disputed Land. That period ended when Ray Atkins ejected them in 1998. In essence, Sanders' argument is that

the statutory clock started over when the hunters started trespassing so Lewis Easter's possession should not be tacked and any pre-1998 acts by Lewis, Amos, or anyone else should be ignored.

"[T]his Court does not consider arguments raised for the first time on appeal." *Pick v. Commonwealth*, 72 Va. App. 651, 665 n.4 (2021) (quoting *Virostko v. Virostko*, 59 Va. App. 816, 827 (2012)); *see also* Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling . . . .").

Here, Sanders did not raise this objection below. She noted a litany of other objections to the circuit court's final order, but none concerned tacking or reliance on pre-1998 acts. Nor did she mention the issue during her closing argument. Whatever its merits, Sanders failed to properly preserve her argument, so we do not address it. *See* Rule 5A:18; *United Leasing Corp. v. Lehner Fam. Bus. Tr.*, 279 Va. 510, 518 (2010) ("[F]or an argument to remain preserved for appeal, the court must be aware of a litigant's legal position.").

### III. The Circuit Court Did Not Err in Its Weighing of the Evidence of the Payment of Taxes, and if It Did, Any Error Was Harmless

Sanders next argues that the circuit court erred by failing to consider evidence of her payment of—and the Easters' nonpayment of—real estate taxes on the Disputed Land. Sanders relies on *Matthews v. W.T. Freeman Co.*, 191 Va. 385 (1950), in which our Supreme Court endorsed the South Carolina Supreme Court's opinion that "the payment of taxes is not evidence of title, but the failure to pay is evidence that no claim was made." *Id.* at 397 (citing *Gadsden v. West Shore Inv. Co.*, 82 S.E. 1052, 1053 (S.C. 1914)). She then argues that neither Lewis nor Amos ever paid taxes on the Disputed Land, while she and her predecessors in title did, and the court erred by not considering that evidence.

This argument is unavailing for a few reasons. First, Sanders' evidence was not definitive. Although the tax rolls she presented suggested that Lewis Easter paid taxes only on

his undisputed 30 acres, the Amelia County tax map includes the Disputed Land in the Easters' property. And "'in the absence of specific factual findings,' we presume that 'the trial court resolved all factual ambiguities or inconsistencies in the evidence in favor of the prevailing party and gave that party the benefit of all reasonably debatable inferences from the evidence.'" *Lisann v. Lisann*, 304 Va. 242, 261 (2025) (quoting *Hill v. Commonwealth*, 297 Va. 804, 808 (2019)). Second, while the Supreme Court in *Matthews v. W.T. Freeman, Co.*, 191 Va. 385, held that the nonpayment of taxes was evidence that no claim was made, *id.* at 399, it did not go so far as to endorse the appellants' argument that the nonpayment of taxes *barred* the appellee's claim of adverse possession. Finally, because the nonpayment of taxes is not conclusive—it is only one piece of evidence to be considered—and because there was more than enough evidence to support the Easters' adverse possession claim, any error by the circuit court was harmless. *Forbes v. Rapp*, 269 Va. 374, 382 (2005) ("Under the doctrine of harmless error, we will affirm the circuit court's judgment when we can conclude that the error at issue could not have affected the court's result.").

### IV. The Circuit Court Correctly Determined That the Easters Established All the Elements of Adverse Possession

"To establish title to real property by adverse possession, a claimant must prove actual, hostile, exclusive, visible, and continuous possession, under a claim of right, for the statutory period of 15 years." *Helms v. Manspile*, 277 Va. 1, 7 (2009) (quoting *Grappo v. Blanks*, 241 Va. 58, 61 (1991)). The claimant must prove all elements by clear and convincing evidence. *Id.* "A single act or piece of evidence may tend to prove more than one element of adverse possession." *Quatannens v. Tyrrell*, 268 Va. 360, 371 (2004). For example, "occupation, use, and improvement of the property" can prove a claim of right, *Grappo*, 241 Va. at 62; actual possession, *La Due*, 201 Va. at 207; and exclusivity and visibility, *Quatannens*, 268 Va. at 371-72.

Even disregarding all pre-1998 acts, the circuit court correctly determined that the Easters established adverse possession based on their actions between 1998 and 2017 (when they filed their complaint).

### A. Actual Possession

"[A]ctual possession is 'absolute dominion and enjoyment of the property.'" *Quatannens*, 268 Va. at 366 (quoting *Taylor's Devisees v. Burnsides*, 42 Va. (1 Gratt.) 165, 190 (1844)). "Use and occupation of property . . . constitutes proof of *actual* possession." *Grappo*, 241 Va. at 62. "The usual kind of actual possession relied upon is occupancy, use[,] or residence upon the premises for the statutory period of time, evidenced by cultivation, enclosure, or erection of improvements, or other plainly visible, continuous and notorious manifestation of exclusive possession . . . ." *La Due*, 201 Va. at 207. While "occasional cultivation" is usually insufficient to show actual possession, *see id.*, more regular or habitual use and cultivation of land can be sufficient, *see Lennig's Ex'rs v. White*, 20 S.E. 831, 837 (Va. 1894). "The character of the acts necessary to vest one with a title by adverse possession varies with the nature of the property involved, the conditions surrounding it, and the use to which the property may be adapted." *Leake v. Richardson*, 199 Va. 967, 976 (1958); *see also La Due*, 201 Va. at 207. "[W]ild and uncultivated land cannot be made the subject of adverse possession while it remains completely in a state of nature; a change in its condition to some extent is essential." *Calhoun v. Woods*, 246 Va. 41, 44 (1993).

Here, the Easters actually possessed both the wooded and open portions of the Disputed Land. Beginning in 1998, Ray Atkins has regularly maintained the existing woods road on the Easters' behalf and has constructed additional woods roads on the Disputed Land. The Easters have, in exchange, allowed Ray and his family to use the land for hunting and to drive recreational vehicles on the woods roads. Ray has also constructed tree stands for hunting in the

wooded portion of the Disputed Land. These acts constitute "change[s] in . . . condition" sufficient to show actual possession of this "wild and uncultivated land." *Id.*[4]

As far as the open portion of the Disputed Land, the Easters have regularly cultivated this land since 1998. True, they did not farm the land while it was enrolled in the soil conservation program, and they only began cultivating it again in 2013. But Jimmy Dawson still regularly bushhogged the field for the Easters throughout the soil conservation period. And under the facts of this case, their actual possession of the wooded portion can extend to the open portion too. *See Taylor's Devisees*, 42 Va. (1 Gratt.) at 190-91 ("Possession may be more manifest as to a part, than as to the rest; but in reference to the whole, possession of part is possession of the entire tract, or parcel.").

### B. Hostile Possession and Claim of Right

"One is in *hostile* possession if his possession is under a claim of right and adverse to the right of the true owner." *Grappo*, 241 Va. at 62. "In other words, the possessor must profess, through words or actions, a belief that he is entitled to use the land and prevent others from using it in a manner that precludes the legal owner from exercising his rights over the property." *Quatannens*, 268 Va. at 372. "Claim of right" means

> a possessor's intention to appropriate and use the land as his own to the exclusion of all others. That intention need not be expressed but may be implied by a claimant's conduct. Actual occupation, use, and improvement of the property by the claimant, as if he were in fact the owner, is conduct that can prove a claim of right.

---

[4] The circuit court also relied on the select cuts of timber in 2011 and 2012 in determining actual possession. Standing alone, these would surely be insufficient evidence of actual possession (especially because they took place only six years before the Easters filed their complaint). *See* Code § 8.01-236 (setting a 15-year statutory period for adverse possession). At most, the select cuts are simply evidence of the Easters' *increased* use of the wooded portion of the Disputed Land during 2011 and 2012. *See Taylor's Devisees*, 42 Va. (1 Gratt.) at 198 ("[T]he degree is immaterial, if the acts be real and bona fide. More or less is unimportant, if there be enough to indicate apparent ownership.").

*Id.* at 369 (quoting *Grappo*, 241 Va. at 62); *see also Veldhuis v. Abboushi*, 77 Va. App. 599, 609 (2023) ("[T]he act of granting another permission to use your property is a clear indication that the grantor views himself, and no other, as the rightful owner and possessor of the property.").

Importantly for this case, a possessor's mistaken belief that he or she owns the subject property can—in some cases—defeat hostility. "[O]ne who possesses another's land under a mistake regarding the boundaries of the property and does not intend to claim land beyond the 'true' property line, cannot adversely hold the land in question." *Brown v. Moore*, 255 Va. 523, 532 (1998). However, the practical test is not "whether the possessor would have claimed title . . . had he not been mistaken as to the true boundary line called for in his chain of title," but "[w]hether the positive and definite intention to claim as one's own the land up to a particular and definite line on the ground existed." *Id.* at 533 (alteration in original) (quoting *Hollander v. World Mission Church*, 255 Va. 440, 443 (1998)). Or as the Court put it a few years later,

> when a claimant mistakenly believes that a particular "line on the ground" represents the extent of his or her own land and treats all the land within the line on the ground as his or her own in a manner that satisfies the other requirements of adverse possession—particularly actual, exclusive, and visible possession—then the hostility requirement is generally satisfied.

*Quatannens*, 268 Va. at 372. So, in *Brown*, the possessors' mistaken belief that they owned the disputed property was not fatal to their adverse possession claim because their excavation and cultivation of the land evinced their intent "to claim the disputed property 'against anybody.'" 255 Va. at 533. That, the Court said, was sufficient to show hostility. *Id.*

Here, the Easters have used and improved the Disputed Land as if they were the owners in several ways since 1998. They have regularly bushhogged the field since 1998 and have rented a portion of the Disputed Land to Russell Wills since 2014. *See Veldhuis*, 77 Va. App. at 609 ("[T]he act of granting another permission to use your property is a clear indication that the grantor views himself, and no other, as the rightful owner and possessor of the property."). Wills

has, in turn, farmed the open portion of the Disputed Land. The Easters, via Ray Atkins, have also expelled trespassers and posted "no trespassing signs" every three years since 1998 or 1999. Ray has "improved" the land since 1998 by building new woods roads and tree stands in the wooded portion. And at one point, he hung a cable gate at the entrance to the woods road (admittedly on the Easters' undisputed property) to prevent others from using that part of the road that goes through the Disputed Land. Finally, the circuit court found that based on the description of their property in the deed, an erroneous Amelia County tax map, and an adjoining landowner's survey, Amos and Patricia Easter mistakenly believed that the Disputed Land was part of their property. They treated the land as such—and in a manner that satisfied the other elements of adverse possession—thereby demonstrating that their possession was hostile to Sanders' legal title and under a claim of right. *Quatannens*, 268 Va. at 369, 372; *Brown*, 255 Va. at 532-33.

### C. Exclusive Possession

"One's possession is *exclusive* when it is not in common with others." *Grappo*, 241 Va. at 62. "The occupancy need not be such as physically to bar out trespassers, but only to manifest unequivocally a claim of ownership on the part of the occupant and preclude all others . . . from using it as their own or in common with the claimant." *Leake*, 199 Va. at 984 (Snead, J., dissenting) (quoting *Lyons v. Fairmont Real Est. Co.*, 77 S.E. 525, 532 (W. Va. 1912)).

Because the hunting club used the Disputed Land for some period of time between 1987 and 1998, the Easters' possession was likely not exclusive for at least a few years. After that, though, they took actions sufficient to establish exclusivity. First, they ejected the trespassers in 1998. Ray then posted around 20 "no trespassing" signs and has continued to update them every three years. *See Maynard v. Hibble*, 244 Va. 94, 98 (1992) (considering "posting" of land as evidence of exclusive and actual possession). Ray also installed cameras on the Disputed Land

about six years before trial to help catch trespassers. Finally, Ray installed a cable gate to keep others (except those with the Easters' permission) from driving on the woods road. *See Quatannens*, 268 Va. at 375 (noting that a gate was evidence of exclusive possession even though it excluded others from only part of the subject property).

Sanders argues that the circuit court improperly shifted the "burden of use to the legal owners of the property by suggesting that they did not demonstrate ownership by harvesting timber." To be sure, the circuit court spent most of its discussion of the exclusivity element on Sanders' apparent failure to use the Disputed Land. But that does not mean that the court improperly shifted the burden. Rather, it correctly focused on one of the most important aspects of exclusive possession: the exclusion of the rightful owner. *See Quatannens*, 268 Va. at 375 ("In order to have exclusive possession, a claimant must 'shut out the rightful owner.'" (quoting *Taylor's Devisees*, 42 Va. (1 Gratt.) at 190)); *Taylor's Devisees*, 42 Va. (1 Gratt.) at 191 (explaining that the hallmark of a disseisor's exclusive possession is the "non-existence of an actual possession on the part of the rightful owner").

### D. Visible, Open, and Notorious Possession

"Possession is *visible* when it is so obvious that the true owner may be presumed to know about it." *Grappo*, 241 Va. at 62; *see also Dawson v. Watkins*, 41 Va. 259, 269 (1843) (explaining that a disseisor's possession must "be accompanied with such visible acts of ownership as from their nature indicate a notorious claim of property in the land").

Here, even considering only the post-1998 actions, the Easters' possession was sufficiently visible, open, and notorious. First, as the circuit court found, the open portion of the land was cultivated for decades and bushhogged regularly while it was enrolled in the soil conservation program. Russell Wills now farms the land and cuts the hay twice yearly. All this activity is observable from the public highway. The Easters' expert testified that the 2011 and

2012 timber harvests would have been apparent to even the untrained eye. Add to that the tree stands in the wooded area, the regular maintenance and construction of the woods roads, the use of recreational vehicles on those roads, the "no trespassing signs," and the cable gate—the record amply supports the circuit court's finding that the Easters visibly, openly, and notoriously possessed the Disputed Land after 1998.

### E. Continuous Possession

"Possession is *continuous* only if it exists without interruption for the statutory period." *Grappo*, 241 Va. at 62. In Virginia, the statutory period is 15 years. Code § 8.01-236. In the event of a break in possession, "the seizin of the true owner is restored, and a subsequent wrongful entry by another constitutes a new disseizin." *Armstrong v. Morrill*, 81 U.S. (14 Wall.) 120, 146 (1871).

Here, Sanders argues that the circuit court only found that the Easters had satisfied the continuity element because it tacked Lewis Easter's possession or at least considered pre-1998 actions. Not so. The circuit court expressly—and correctly—found that the Easters' period of ownership, "especially the period from 1998 to the present," established their continuous possession of the Disputed Land for the statutory period. Viewed in the light most favorable to the Easters, the evidence established that they met all the elements of adverse possession without interruption from 1998 to 2017.

In sum, the circuit court correctly found that the Easters established adverse possession of the Disputed Land by clear and convincing evidence.

### CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*